HAL D. MOSLEY AND WIFE, HILDA P. MOSLEY v. PERPETUAL SAVINGS AND LOAN ASSOCIATION

No. 7618SC54

(Filed 18 August 1976)

**Contracts § 27— contract to procure survey — time for obtaining — no breach of contract**

In an action for breach of contract where plaintiffs alleged that they entered into a construction loan contract with defendant which included a provision by defendant to secure a survey of plaintiffs' property to insure that the residence to be built thereon would be located within the boundaries of said property, defendant's motion for directed verdict should have been allowed, since the contract on which plaintiffs based their claim was secondary to the principal contract for the construction loan, and, while the evidence tended to show that defendant agreed to order a survey after being notified that the footings of the house had been poured, there was no evidence tending to show that defendant agreed to procure a survey immediately after being so notified.

APPEAL by defendant from *Albright, Judge*. Judgment entered 21 August 1975 in Superior Court, GUILFORD County. Heard in the Court of Appeals 6 May 1976.

This action is based on alleged breach of contract. In their complaint, plaintiffs allege in pertinent part:

On 23 March 1973 plaintiffs and defendant entered into a construction loan contract which included a provision by defendant to secure a survey of plaintiffs' property to insure that the residence to be built thereon would be located within the boundaries of said property. Plaintiffs advanced defendant $35 to pay for the survey and were to notify defendant when the footings of the residence had been poured after which defendant would procure the survey. Although plaintiffs notified defendant when the footings were poured, defendant failed to provide a survey at that time.

A survey made after the house was well under construction disclosed that it was partially built on the property of another landowner. Defendant breached the contract by failing to secure a survey at the time the footings and foundation were completed; cost of correcting the error at that time would have been minimal. As a result of defendant's breach of contract, plaintiffs have sustained damages amounting to $9,899.75 representing cost of relocating their garage, diminished value of the

house and additional rent and interest paid due to delay in completing the house.

In its answer defendant denied material allegations of the complaint and alleged that the error in locating the house on the lot was due to the negligence of plaintiffs and the builder of their house.

Plaintiffs and defendant presented evidence, pertinent parts of which are hereinafter summarized.

Issues were submitted to and answered by the jury as follows:

"1. Did Defendant breach the contract between the parties as alleged in the Complaint?

ANSWER: Yes.

"2. If so, what amount of damages are Plaintiffs entitled to recover of Defendant?

ANSWER: 9,899.75."

From judgment entered on the verdict, defendant appealed.

*Morgan, Byerly, Post, Herring & Keziah, by Steven E. Byerly and J. V. Morgan, for plaintiff appellees.*

*Sprinkle, Coffield & Stackhouse, by H. Irwin Coffield, Jr., for defendant appellant.*

BRITT, Judge.

Defendant assigns as error the failure of the court to grant its motion for directed verdict pursuant to G.S. 1A-1, Rule 50, interposed at the close of the evidence.

Plaintiffs' claim is based on their contention that they and defendant entered into a contract whereby defendant agreed that *immediately* following notification that the footings for the house had been poured defendant would procure a survey of the property to make certain that the house was located within the boundary lines of plaintiffs' lot; that although defendant was notified immediately after the footings were poured it delayed procuring a survey until considerable work had been done on the house; and that as a result of the delay plaintiffs sustained the damages sought.

"To constitute a valid contract, the parties must assent to the same thing in the same sense; this assent is commonly known as a meeting of the minds." 2 Strong, N. C. Index 2d, Contracts § 2, p. 293. "But where the agreement is so vague and uncertain that no *definite* agreement can be ascertained, there is no valid contract." (Emphasis added.) *Ibid.* § 3, p. 296.

Plaintiffs' evidence consisted of testimony by the male plaintiff and the builder, Lee Mauldin, and certain exhibits. The male plaintiff's testimony relative to the alleged contract and its breach is summarized in pertinent part as follows:

On or about 23 March 1973 defendant approved plaintiffs' application for a loan of $28,650 to provide funds to construct a house on lots previously purchased by them. On said date the male plaintiff signed a loan statement prepared by defendant which listed various charges including a survey fee of $35, the total charges amounting to $1,522. At the same time he and Mauldin signed a construction loan agreement with defendant which contained a provision that they would "construct said building(s) wholly within the boundary lines of the land offered as security, and located as shown on a survey approved by [defendant]." Said agreement also contained the following: "Additional provisions and conditions: *Notify savings and loan* as soon as footings are poured so that a final survey may be ordered. No funds will be disbursed until we have a final survey in our files."

Thereafter Mauldin began work on the house and at Mauldin's request male plaintiff notified defendant's Mr. Frye when the footings were poured. At that time Frye told him he did not understand the notification because the builder could not draw on the loan proceeds until the house was "dried in." Around 27 June 1973 he was advised by a representative of defendant that a plat of survey bearing that date disclosed that two feet of the garage extended onto the lot of an adjoining owner. On that date the house had been dried in—framed, roof on, windows and sheetrock hung, etc. After considering several alternatives, including an effort to purchase part of the adjoining lot, plaintiffs agreed with the builder to tear down the garage and rebuild it completely on their lot.

On cross-examination the male plaintiff stated: Before starting construction of the house a representative of defendant told him that he did not have to do anything about the survey.

Prior to and after purchasing the lot no one ever showed him the corners of his property. When the builder laid out the house " . . . he told the builder the general vicinity of where the lot was; that there were no stakes there and that he told Mr. Mauldin what he felt was the land and to put the house in the center of it. . . . " He relied on Conrad (the realtor who sold the lot) "as to where his land was" and defendant did not make any representation regarding what was his land.

Mauldin's testimony on cross-examination included the following:

"At the time he built this home he did not own a surveyor's transit but simply a surveyor's level. He staked the house off as close as he could to where Mr. Mosley told him to put the house on the lot, that he did not walk around the outer perimeter of the lot with Mr. Mosley; that he made no effort to locate the stakes and in the past he had always relied on the Perpetual Savings and Loan Association to secure survey, that the Perpetual Savings and Loan Association required a survey for their own protection since they did not want a house which was not on the lot."

The disbursement schedule of the construction loan agreement (plaintiffs' exhibit 3) provided that the initial disbursement would be made following rough grading of the lot and when footings and foundation, subflooring and framing, sheeting, roof and chimney were completed.

Defendant's evidence with respect to a survey of plaintiffs' property is summarized in pertinent part as follows:

When plaintiffs applied to defendant for a loan, its loan officer advised plaintiffs that a plat of survey showing that the house was located on the lot would be required before any loan funds were disbursed; that defendant should be notified as soon as the footings were poured so that defendant might *order* a survey. Mr. Frye did not recall the male plaintiff informing him that the footings had been poured.

Defendant requires a plat of survey of all real estate on which it makes loans in order to make certain that the improvements are on the land. This requirement also benefits the borrower who may provide the survey but if he does not, then defendant will obtain it.

Around 17 June 1973 Mauldin informed defendant that the house had been closed in and that he wanted to draw some funds. Defendant inspected the house on 18 June 1973 and determined that it was approximately 19 percent completed. Finding that it did not have a plat of survey, defendant immediately ordered a survey which was made within a few days thereafter. On or about 27 June 1973 defendant was furnished a plat showing the encroachment. Immediately thereafter defendant notified plaintiffs of the problem and efforts were begun to solve it.

Although we have considered plaintiffs' evidence in the light most favorable to them, and only that part of defendant's evidence which does not contradict but only supports, clarifies or explains plaintiffs' evidence, we conclude that defendant's motion for directed verdict should have been allowed.

Without question the principal contract between the parties related to the loan from defendant to plaintiffs. The alleged contract on which plaintiffs base their claim was secondary to the principal contract. While the evidence tended to show that defendant agreed to order a survey after being notified that the footings had been poured, we find no evidence tending to show that defendant agreed to procure a survey *immediately* after being so notified.

For the reasons stated, the judgment appealed from is

Reversed.

Judges PARKER and MARTIN concur.